## NASH *v.* THE STATE.

An indictment is good, which clearly states all the facts necessary to constitute the crime of murder, under the statute.

An indictment need only state such facts as are required to be proved.

If a criminal act has been committed in one county, and consummated in another, the offender may be indicted in either county.

Where a mortal blow was inflicted in Scott, from which death took place in Muscatine county, it was held that the latter county had jurisdiction.

The statute, which provides that "when a person shall commit an offence

Nash v. The State.

on board of any vessel or float, he may be indicted for the same in any county, through any part of which such vessel or float may have passed on that trip or voyage" is not confined to that part of the trip or voyage which had been performed before the offense was committed, but it extends to the entire trip.

A prisoner cannot complain of proceedings which were beneficial to him, and in compliance with his request.

Where depositions are taken by the procurement and for the benefit of a prisoner, and are not read to the jury by his counsel, they may be read by counsel for the state, if they were filed and properly in the custody of the court.

## *Error to Muscatine District Court.*

*Opinion by* WILLIAMS, C. J. At the October term of the district court of Muscatine county, Henry Nash the prisoner was indicted for the murder of one Littleton J. Reddin. The record shows that Nash was, at the time of the finding and filing of the indictment, in custody. He at that term appeared and by his counsel moved for a continuance of his cause. At his instance the cause was continued for trial until Tuesday the twenty first day of November, to which time the court was adjourned. The court at the same time, upon the request of the prisoner accompanied by a proper showing, entered an order granting leave to take the depositions of witnesses to be used on the trial of the cause, "if it should be made to appear to the court that personal attendance of the witnesses could not be procured by proper diligence."

It was also agreed, by the defendant in person, that the regular panel of jurors of that term might be discharged, and that the judge might issue an order to the sheriff for the summoning of a jury for the trial. The prisoner by his counsel then filed in the clerks office his notice and interrogatories in accordance with the statute, to take the depositions of witnesses. The record also shows that the cause was not tried on the twenty first day of November 1848, that being the day to which the court had been adjourned; but on the twenty eighth day of that month the court commenced its session for the trial. On that day

Nash the prisoner filed among the records of the cause, his written acknowledgment that the trial had been adjourned from the 21st until the 28th of November, at his request and for his own benefit. On the 28th day of November 1848 the prisoner was duly arraigned, and put in his plea of "not guilty." The jury was impanneled and qualified, the parties heard and the prisoner found guilty of manslaughter. After the rendering of the verdict, the counsel of the prisoner made a motion to arrest the judgment, which was overruled by the court, and sentence pronounced.

Several bills of exceptions, during the trial, were taken to the ruling of the court, within which all the points of law, relied on by the counsel for the prisoner, are set forth: and on which, it is urged here, that error is manifest in the proceedings of the court below.

The following errors are assigned :

1st. The indictment does not clearly charge that the beating and wounding were feloniously done : nor that the killing was unlawful.

2d. The wounds are not described. The time of the death is not sufficiently set forth. The conclusion is bad.

3d. The indictment is not made up of charges and specifications, as is required by statute; nor is an indictable offense so clearly charged therein that a judgment can be given thereon.

4th. The indictment charges that the offense was committed on board a steam-boat in Scott county, which boat afterwards passed through the county of Muscatine. The statute gives no jurisdiction in such state of facts to Muscatine county.

5th. The depositions of witnesses were read by the state.

6th. Judgment was against the defendant, when by the law of the land there should have been no judgment.

7th. There was no court in session when the pretended trial was had.

The first assignment of error is that the charge of the offense therein is defective. "That it does not allege the

Nash v. The State.

beating and wounding to have been done *feloniously*, nor that the killing was *unlawful*. The first count in the indictment charges that " Henry Nash to wit: on the 14th day of September in the year of our Lord eighteen hundred and forty eight, in the county of Scott, in the state aforesaid, wilfully, feloniously, and with malice afore--thought, with force and arms did make and assault upon one Littleton J. Reddin, then and there being in the peace of the state, and him the said Reddin, did beat bruise and wound upon his head, with an iron bar of which beating, bruising and wounding the said Reddin afterwards, to wit: on the eighteenth day of the same month of September in the aforesaid county of Muscatine, did die," and then concludes with the averment "that the said Henry Nash, in manner aforesaid did feloniously, wilfully, and of his malice aforethought commit the crime of murder against the peace &c., and contrary to the form of the statute in such case made and provided."

The second count sets out the time and place when and where the beating and wounding occurred, adding that it happened on the steam boat Ohio Mail, "which afterwards passed through the said county of Muscatine;" and then charges that the said Reddin on the eighteenth day of the said month of September, of the beating and wounding aforesaid at the county of Muscatine aforesaid did die. This count is concluded, also, by an averment that the beating wounding and killing was done "feloniously and with malice aforethought" whereby the said Nash committed the crime of murder.

The third count sets out the beating and the wounding as having been done on the same day as in the former counts, and that the said Nash having so beaten, bruised, and wounded the said Reddin "feloniously" and of his malice aforethought that he, the said Reddin afterwards " died of the wounds and injury inflicted by said beating and wounding" and concludes "against the peace &c."

It is true that in this indictment some of the terms used in setting out the charge of murder are not employ-

Nash *v.* The State.

ed in accordance with the old forms which are found in the proceedings at common law, and under the provisions of some of the statutes of the old states, in like cases. There is now a prevailing tendency to simplify legal proceedings, by divesting them of superfluous verbiage and useless repetitions, which can only serve to present the crime, so charged in awful sound and form; without giving to, or taking from it, any thing to render it more substantial or distinctive. It is, certainly, the duty of legislatures, and judicial tribunals, to aid in that advancement and improvement in the judicial proceedure of our country, which increase of knowledge, by experience and education, demands. Every student must be aware of the great difference between the modes and forms in the legal proceedure of the courts of the olden time and those of modern date. It is most certainly true, that professors of law, and jurists, may never see the day when they can dispense with such great luminaries as Coke, Blackstone, and their compeers; who in the dawn of proper civil association, arose over comparative chaos, and shedding the light of mighty intelligence, drawn from the supreme source of truth and justice, upon the confused and discordant multitude of mankind, marked out and described the line between right and wrong, and taught the means of their ascertainment. Theirs were the master minds, which, in view of the wants of mankind, associated by civil compact, by erecting a mighty system of jurisprudence on principle, rendered the establishment of reason and right feasible among men. They, in their day and generation, acting with a wise reference to the onward moving, upward rising and expanding spirit of associated *civilized* man; newly modeled the temple of justice by dispensing with the unmeaning ceremonies which the jurists of antiquity had prescribed for the observance of those who would enter its gate and take down the ponderous curtains which darkened the aisle, leading to her shrine, leaving all that was, by them, deemed necessary to support and substantially preserve the edifice. In our day,

Nash *v.* The State.

the wants of society, as we find them, in the advanced, and enlightened, condition of the civilized world; and the spirit, which moves in the life of educated man, admonish those who are called to minister at the altar of justice, to lay aside all mere forms and ceremonies, and at the same time carefully to preserve what is necessary, in substance, to give vitality and effect to principle. Truth and justice are living and eternal principles. To administer justice and truth, there must be appropriate system. Well defined rules of action, based on principle, cognizable by the mind of man, are essential to enable him to understand, and maintain his rights whilst in the conflict of life. In the ascertainment and establishment of justice, between men so far as the mode or form is concerned in presenting a charge or accusation, it should be intelligible, certain, and definite; truthfully and substantially presenting, against the accused, an offense known to, and defined by the law. In doing this, whether the definition of the offense be by common law, or statute, it is requisite that the terms of description, prescribed by the law, should be carefully observed; more or less than this, is not to be required by the courts.

In the formation of the criminal code of our state, one of the first things attempted was the establishment of such a system, as would be consistent with the spirit of the time, in which we assumed civil organization. Such being the design of our legislature, a criminal code was enacted, by which offenses against the welfare of society, and " the peace and dignity of the state" have been defined, and the mode of judicial proceedure and practice pointed out. It is the positive duty of courts to observe and maintain the distinction which is clearly enjoined by constitutional law, so as, carefully, to avoid interference, and usurpation of power by either of the several departments of government. Indeed, to the judicial tribunals is this great conservative power confided. To them, alone, in the last resort, must the aggrieved party look for relief. It is properly the province of the legislature to alter the

common law, by enactments deemed conducive to the wel-
fare of the state.   Such laws emanating from that body,
are presumed to express the will of the sovereign people;
and when enacted, within the prescribed limits of the
constititution, are binding as the law of the land, and
must be observed.   It is the imperative and only duty of
the courts to expound and enforce the observance of the
laws, not to enact them.   Then, tested by the requirements
of our statutes, defining the offense here charged, and
prescribing the practice of our courts under the criminal
code, does this indictment contain such " charges and
specifications" as are sufficient to justify the court in en-
tering judgment, and passing sentence in accordance with
the principles of the law of the land?   We think it does.
It presents the complaint or accusation as commenced in
the name of " The State of Iowa," in order that it may
" be carried on in the name, and by the authority of the
same."   The venue is laid in the county of Muscatine, as
the place of jurisdictional power, where the bill purports
to have been found by the grand jury.   The day, on which
the wound was inflicted by the accused upon the person
of the deceased Reddin; the day on which he died;
the county within which he died; the felonious intent and
malice aforethought, with which the blow was inflicted;
the weapon used, and by which the killing was perpe-
trated; the part of the body, upon which the wound was
made; and the averment that the death was caused by
the wound thus inflicted, with the allegation that the act
was wilful and against the statute in such case made and
provided, are all charged specifically in each count; ex-
cept that the last count lays the offense in general terms,
as having transpired in Muscatine county.   Each count
is concluded with the charge, that, by the specific means
and acts therein set forth, and described, the accused had,
then and there committed the crime of murder.   Such be-
ing the substantial ingredients, in fact, composing the in-
dictment, how do they stand the test of legislative require-
ment?

The act defining this crime, declares that "murder is the unlawful killing of a human being, in the peace of the United States, (State of Iowa.) with malice aforethought, either express or implied." *Rev. Stat.* 165, § 4.

The second section of the same act declares that, "the manner of the killing is not material, further than it may show the disposition of mind, or the intent with which the act was committed."

The fourth section enacts, that "in order to make the killing murder, it is requisite that the person injured die within a year and a day, after the stroke received, or the cause of death administered."

The act entitled "An act regulating criminal proceedings," *Rev. Stat.* 153, § 46, provides, that "the body of the indictment shall be considered as made up of charges and specifications, and no indictment shall be quashed, if an indictable offense is, clearly charged therein; nor shall any motion be entertained, with a view to arrest, *reverse*, or set aside any judgment, on account of a defect in the indictment, if the charge, upon which the offense was tried, be so explicitly set forth, that judgment can be rendered thereon."

Section forty-eight of the same act provides, that "nothing need be stated in the body of an indictment, which is not required to be proved upon the trial in support of the charge."

This indictment declares, that the deceased was killed by the accused Nash "feloniously, and with malice aforethought" and, substantially and distinctly avers that the act was done in violation of or "against the statute in such case made and provided." Although the precise term "unlawfully" is not used, still, as it is charged to have been done "against the statute &c.," it must be taken as done unlawfully, and the use of the precise word, is not indispensable to aid the language used in the indictment, to convey the idea required by the statute as a charge to make up the crime. The statute is the law. If the act

complained of, was done in violation of it,.it was done unlawfully.

The second assignment of error is answered by the forty-sixth section of the act regulating criminal proceedings cited above, which provides that "no judgment shall be arrested, *reversed*, or set aside on account of any defect in the indictment, if the charge upon which the offender was tried, be so explicitly set forth, that judgment can be rendered thereon." There can be no mistake as to the offense here charged. All the facts necessary to constitute the crime of murder under the statute, so that judgment in accordance with the law, could be rendered, are clearly stated.

The statute only requires such facts to be stated in the indictment, as are required to be proved on the trial. This requisition as we have shown by a statement of the contents of the indictment, has been fulfilled and substantially observed.

It is also contended and urged, for ground of reversal of the judgment of the court below, that "the time of the death of Reddin is not sufficiently set forth." The indictment states, that the wound was inflicted on the fourteenth day of September A. D. 1848, and, that Reddin died, in consequence thereof, on the eighteenth day of the same month, being four days after he received the wound. This for all legal purposes, is sufficiently certain, and conclusive, as to the time of his death; being within the limitation prescribed by the statute, in which the death must occur to make the killing murder.

An objection is also made to the validity of the indictment, because the wound is not particularly described. We know that precedents are numerous in which particular description of the wound, as to length, depth and breadth, is set forth, and that they have been followed even till the present day, by some who are learned in the legal profession. Such particularity cannot vitiate an indictment; and may serve to enlarge and render it quite formidable and imposing; but as the law is now, under the

provisions of our statute, this is not requisite. So far as the wound is concerned, it·is sufficient to aver that it was inflicted by the accused on the person of the deceased, that his death was caused by it, and that the act was done within the jurisdiction of the court.

Enough has been presented, to show that the validity of the indictment is not successfully assailed by the 1st, 2d, and 3d, assignments of error, and that with reference to them, the judgment of the court is in accordance with the law.

It is contended, that the district court of the county of Muscatine, had not legal jurisdiction of the offense, and proceedings thereon. That the act was perpetrated in the county of Scott, on board of a steamboat, and that the boat *afterwards* passed through the county of Muscatine. The blow was given, and the wound, of which the deceased died, was inflicted in the county of Scott. From thence the boat, on which the parties in the transaction were, passed down the river, and stopping at the town of Bloomington, in the county of Muscatine, the wounded man, Reddin, was taken ashore, and Nash the prisoner, was committed to prison, there to await his trial. He was there tried and convicted.

Here again, the legislature of the state, foreseeing the possibility of such occurrence, and the necessity of providing for it, by convenient and positive enactment, have -prevented the success of such objection. *Rev. Stat.* 153, § 42, provides, that "where a criminal act has been committed in one county, and consummated in another, (as where the mortal blow was given in one county, and the death took place in another,) the offender may be indicted in either county." The application of this act to the case at bar is too obvious, to allow of any discussion. "The mortal blow was given" in Scott county, "and the death took place in" the adjoining county of Muscatine. The statute, therefore, conferred jurisdiction of the case on Muscatine county.

But it is further contended, that the offense was com-

mitted on a steamboat, and that the boat afterwards pass-
ed through the county of Muscatine, and in such case the
statute confers no jurisdiction.   This objection is put upon
the peculiar language of the statute relative to the com-
mission of offenses on steamboats or other vessels, passing
upon a voyage by, or through the state.   *Rev. Stat.*, 152,
§ 39, enacts that " where a person shall commit an offense
within this territory (state) on board of any vessel or float,
he may be indicted for the same, in any county through
*any part* of which, such vessel or float *may have passed*
on that trip or voyage."   The point made here, by the
counsel for the prisoner is, that the indictment was found,
and trial had in a county through which the boat passed
*after* the mortal wound was given, or the offense commit-
ed; and therefore, the act of the legislature applying to
counties, or part thereof, through which the vessel had
previously passed, conferred no jurisdiction on that county.

What is the obvious intent of this act?   Clearly to pre-
vent the escape, with impunity, of offenders against the
law, by securing their arrest, in case of the commission
of crime on vessels afloat within the jurisdiction of the
state.   The rapidity with which steamboats move, and the
secrecy of night travel on them, as well as other craft
used on the streams, required that extraordinary means
should be resorted to, in order to prevent, detect and pun-
ish where more than common opportunity was presented
for the commission of crime, and escape from its punish-
ment.   To confine the operation of this section of the law
to counties, through which such boat had already passed,
would in many, if not most instances of crime thus com-
mitted, thwart the evident design of the enactment, by
leaving the offending crew of a vessel, a clear and open
channel to run before the law.   The officer of the law,
would be unable to exert his power until " the boat had
left him."   It certainly, cannot be supposed, that a special
provision of this kind would be enacted for any other
purpose than to extend the jurisdiction of the law, so as

to secure the end of justice, by rendering such transient offenders amenable to the sure hand of the law.

But we think, the language of the law, when fairly construed, settles this question. It expressly refers to "that trip or voyage," meaning any county through which the vessel may have passed whilst performing her "trip or voyage." The vessel on which the offense was committed, as the record shows, did pass on her "voyage" from Scott county, down the river Mississippi, to the county of Muscatine where the offender, Nash, was arrested, tried and convicted. The whole proceeding was within the jurisdiction of the state of Iowa, and the boat having passed through a part of the county of Muscatine, within which the arrest was made, we think jurisdiction of the case was properly and legally exercised by the district court of that county, as far as this point is concerned.

The objection that the district court of Muscatine county was not legally in session when this cause was tried, and judgment given, is answered by the record. It appears, that the indictment was regularly found by the grand jury, at a regular and legal term of the court. It further appears, that the cause was twice continued, and the court as often adjourned, at the *particular request* of the prisoner, *and for his benefit*, by his agreement on file. It certainly is unnecessary to resort to argument, to show that the court below was not in error here. The humane indulgence of the court in granting further time to the prisoner, who stood for trial in a capital case, when it was prayed for by the accused himself to enable him to procure the testimony of his witnesses, in defense of his life, cannot be successfully pleaded as error, so as to affect the judgment in the case, by him. He cannot complain of error in a proceeding which was clearly beneficial to him, and which was had in answer to his own request.

It only remains for us to dispose of that assignment of error, relative to the reading of the deposition on part of the prosecution. The dedimus to take the depositions was prayed for, granted and taken at the instance and on be-

half of the prisoner, and plaintiff in error here. And the depositions having been returned and opened, by leave of the court, after being properly filed as a part of the case, the court allowed the prosecuting attorney to read them on part of the prosecution. To this proceeding the counsel for the prisoner neither objected nor consented. This action of the court in the case, is complained of here, as illegal; and for it a reversal of the judgment is urged. For the protection of the rights of the accused, the provision and power of the constitution is invoked, and it is claimed in his behalf, that he had a right to "be confronted by his accusers and the witnesses of the state." It is, most clearly, the duty of the court to guard carefully, the rights of a citizen when upon trial for high crime. It is bound to see that he has a full fair and impartial trial, under the constitution and the laws. Has he been, in this case, denied the benefit of this right? The testimony was of his own procurement. The witnesses were selected by himself, and he propounded the questions which were answered by them. At his instance, the depositions were returned and filed in the court, as part of the case, for hearing, and in order to sustain his defense on the issue joined. The evidence if relevant and material, was in the possession of the court, by his own act. It had not, in any way, been subject to the control of the prosecution, until after it was filed in the case, as the testimony of the prisoner, for his own benefit; when filed, it was in the custody of the court, as evidence in the case. We cannot see, under the circumstances, how moral wrong, or injustice in fact, could be done to the prisoner. Whether the depositions were read by the counsel for the state, or for the prisoner, could not materially affect the merits of the case. The bill of exceptions does not show that the prisoner, or counsel, offered any objection to the reading of them, by the attorney for the state, at the time; but merely took an exception to the ruling of the court in suffering them to be read. Nor does it appear, that any intention was shown, or attempt made by the prisoner, or his coun-

Nash v. The State.

sel, to withdraw the depositions from the files of the court or the trial of the cause. It is the mere act of reading them, by the counsel for the state, which is excepted to. Was the court legally justified in thus permitting the evidence of the prisoner to go to the jury? We think this ruling of the court is warranted by the act of the legislature, "regulating criminal proceedings." *Rev. Stat.* 160, § 109, where it is enacted that "the power and practice of the courts in criminal matters, shall (except so far as herein modified,) remain the same, as they have heretofore been; and shall as far as practicable, be made to coincide with the corresponding practice in civil cases." By turning to "An act regulating the mode of taking depositions, and to provide for the perpetuation of testimony" in civil proceedings, *Rev. Stat.* 228, § 9, we find that it is provided that "all depositions taken in pursuance of this act, *when returned into court*, may be read by either party, on the trial of the cause, to which they relate." Here the legislature again, we think, has given direction to the power and action of the court in relation to the practice in this very matter. We view the course adopted, and acted upon by the court, as in accordance with the practice prescribed by these acts taken in connexion, and fairly construed. This view of the questions contemplates this construction, and the legislative enactments on which it is put, as substantially free from constitutional objection, and working no wrong to the prisoner, by taking from him his legal rights; whilst the great designs of judicial trial, the ascertainment of truth, and advancement of justice, are attained by the court. The court below by its proceedings in the case, as it appears of record, as well as the counsel for the prosecution, seems to have extended to the defendant every opportunity of making manifest his innocence, consistent with "the law of the land," administered with a careful regard for the public security and weal, as well as the rights of the accused. We see nothing in the errors assigned, which, viewed in the light of

reason, justice, or law, will warrant us in interfering with the judgment of the district court.

Judgment affirmed.

*S. Whicher*, for the prisoner.

*W. G. Woodward*, for the state.